## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CIVIL ACTION NO. 1:12-CR-058-2** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **FAREED RAY**, | : | |

## MEMORANDUM

Presently before the court is defendant Fareed Ray's ("Ray") motion to suppress evidence.  (Doc. 211).  For the following reasons, the court will deny the motion.

## I.  Findings of Fact[1]

On the morning of February 2, 2012, Pennsylvania State Police Trooper Justin Gardner ("Trooper Gardner") arrested Michael Bobb ("Bobb") in Perry County, Pennsylvania after a traffic stop.  (Doc. 227 at 4).  During the traffic stop, troopers had performed a consent search of the vehicle and located two firearms and drug paraphernalia.  (Id. at 4, 17).  Bobb also had an outstanding warrant for a parole violation.  (Id. at 5).

After Bobb was arraigned, Troopers Jay Mearkle ("Trooper Mearkle") and Scott Fidler ("Trooper Fidler") interviewed him at the Perry County Courthouse.  (Id. at 5, 16, 46).  Bobb explained that he had intended to travel to Harrisburg to

---

[1] The court's findings are based upon the court's assessment of the credibility of the testimony and information provided at the February 24, 2014, hearing on the motion.  Defense counsel provided the court with a number of exhibits that were never discussed at the hearing or otherwise entered into the record.  The court did not consider those exhibits.

trade stolen firearms for a quantity of drugs with an individual named "Diego." (Id. at 5, 46). Bobb explained that he had engaged in such transactions with "Diego" for the past few months. (Id. at 46). Bobb also indicated that he would be willing to arrange a transaction with "Diego" for that day. (Id. at 5, 46).

Bobb provided the troopers with a phone number linked to "Diego," (717) 303-4033, and then Bobb placed a phone call to that number in the troopers' presence. (Id. at 6, 23, 48). The troopers did not attempt to record this initial phone call and they were only able to hear Bobb's half of the conversation. (Id. at 6-7). During the phone conversation, Bobb arranged to purchase two bundles of heroin and two eight balls of cocaine from "Diego" in exchange for a firearm. (Id. at 7).

After the initial phone call, the troopers contacted other law enforcement personnel to determine if anyone knew an individual known as "Diego." (Id. at 8-9, 46-47). The troopers learned that Ray was known as "Diego," but they were uncertain how they obtained this information. (Id. at 8-9, 19). Trooper Mearkle believed U.S. Marshal Duncan identified Ray as "Diego." (Id. at 8). Trooper Fidler received a picture of Ray on his phone, but cannot recall how it was obtained. (Id. at 47). Trooper Mearkle believed the photograph was obtained through database records, but cannot recall the specific database used. (Id. at 8-9, 20-21). When the troopers showed Ray's photograph to Bobb, Bobb identified Ray as "Diego." (Id. at 9, 47).

Trooper Mearkle subsequently contacted Drug Enforcement Administration Special Agent Bill Cook ("Agent Cook"), who advised Trooper Mearkle that the

matter may very well be investigated and prosecuted federally, and therefore directed Trooper Mearkle to record any future phone calls between Bobb and "Diego." (Id. at 10, 37).  Trooper Mearkle placed a recording device on Bobb's telephone, but he mistakenly plugged it into the microphone jack instead of the audio jack. (Id. at 10-11).

At approximately 5:17 p.m., Bobb called "Diego" again from Trooper Mearkle's vehicle and stated that he would meet "Diego" at a Burger King located at Cameron and Maclay Street in Harrisburg. (Id. at 11-12, 61).  Due to Trooper Mearkle's error, the recording device only recorded Bobb's side of this conversation. (Id. at 10-11).  During this conversation, Bobb also changed the original arrangement from two bundles of heroin and two eight balls of cocaine for a firearm to three bundles of heroin, three eight balls of cocaine, and a different firearm. (Id. at 12).  Bobb stated that he wished to trade a .45, similar to a firearm he had provided "Diego" in the past. (Id.)

Trooper Mearkle established a surveillance team, and planned to arrest "Diego" at the conclusion of the planned transaction. (Id. at 12-13).  At 5:30 p.m., Bobb contacted the same phone number.  He advised "Diego" that he was at the Burger King and that he was going inside to get something to eat. (Id. at 13).  Approximately three minutes later, "Diego" called from the same number, advised Bobb that he was five minutes away, and instructed Bobb to come out of the Burger King to meet him. (Id. at 14).  These conversations were unrecorded.

Meanwhile, Trooper Fidler was conducting surveillance of the Burger King. (Id. at 51).  Trooper Fidler observed a silver Honda pull around to the back parking lot of the Burger King, and Trooper Fidler identified Ray as the rear passenger. (Id.)  Trooper Fidler observed the Honda stop in the parking lot momentarily before it pulled out of the Burger King parking lot.  (Id. at 51-52, 65).  Several troopers followed the Honda, but they lost surveillance of it for a minute or two.  (Id. at 69).

At approximately 5:49 p.m., "Diego" called Bobb again from the same number, stated that the location was "too hot," and changed the meeting location from the Burger King to 20th and Herr Street.  (Id.)  Bobb stated that "Diego" told him to stay on the phone until Bobb arrived at the new meeting location.  (Id. at 15-16).  This conversation also went unrecorded.  At this time, Trooper Mearkle exited the vehicle and called Trooper Fidler to advise him of the location change.  (Id. at 15).  Trooper Fidler and other surveillance team members relocated to 20th and Herr Street.  (Id.)  When Trooper Mearkle stepped back into the car, Bobb advised him that "Diego" wished to speak with him.  (Id.)  Trooper Mearkle took the phone from Bobb and ended the call.  (Id.)

When Trooper Fidler arrived at the area near 20th and Herr Street, he observed the same silver Honda parked at 20th and York street, which is approximately three blocks away from the intersection of 20th and Herr Street.  (Id. at 53, 70-71).  Trooper Fidler testified that the vehicle's location provided a good vantage point of the intersection of 20th and Herr Street.  (Id. at 53).  After Ray was identified as the passenger in the back seat, Trooper Fidler arrested him for

4

attempt to deliver a controlled substance. (Id. at 54). Trooper Fidler searched Ray incident to arrest, and recovered a small amount of marijuana and cash. (Id. at 54-55). He also recovered Ray's cell phone from the floorboard where he was sitting. (Id. at 55). Trooper Mearkle called the phone number attached to "Diego," (717) 303-4033, and his call was directed to Ray's cell phone. (Id. at 55). After receiving consent to search the vehicle from the vehicle's driver, Trooper Fidler recovered a half ounce of cocaine in the center console of the vehicle. (Id. at 55). At that point, the two other occupants of the vehicle were placed under arrest. (Id. at 56). Ray was later strip searched, and officers recovered crack cocaine from his person. (Id. at 56).

## II.   **Procedural History**

On February 29, 2012, a grand jury returned a ten-count indictment against Ray and four others. (Doc. 1). A superseding indictment was filed on February 20, 2013, charging Ray with 1) conspiracy to distribute heroin, cocaine, and cocaine base; 2) possession with the intent to distribute and distribution of heroin, cocaine, and twenty-eight grams and more of cocaine base from August 2011 to January 9, 2012; 3) the possession, carrying, and use of a firearm during and in relation to and in furtherance of a drug trafficking offense in December 2011; (4) possession with the intent to distribute and distribution of heroin, cocaine, and cocaine base from January 22, 2012 to February 2, 2012; 5) the possession, carrying, and use of a firearm during and in relation to and in furtherance of a drug trafficking offense on January 28, 2012; (6) possession with the intent to distribute and distribution of

cocaine, and cocaine base on February 2, 2012; (7) conspiracy to possess a firearm

in relation to, and in furtherance of the distribution of heroin, cocaine, and cocaine

base. (Doc. 107). Ray pleaded not guilty to all counts. (Doc. 118).

On January 13, 2014, Ray filed the instant motion to suppress. (Doc. 211).

The court conducted an evidentiary hearing on the motion on February 24, 2014.

(Doc. 221). The motion is fully briefed and ripe for disposition.

## III.   <u>Discussion</u>

Ray contends that the troopers did not possess sufficient probable cause for

his arrest. Ray also asserts that the troopers' attempted interception and recording

of the telephone call between Mr. Bobb and Ray violated the Electronic

Communications Privacy Act, 18 U.S.C. § 2510 *et seq*. Thus, Ray requests the court

to suppress the telephone recordings, any statements made following his arrest, and

any physical evidence recovered following his arrest.

### A.     **Probable Cause to Arrest**

Ray contends that his arrest was unconstitutional under the Fourth

Amendment because the troopers did not possess sufficient probable cause. The

Fourth Amendment of the United States Constitution secures "persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. CONST.

amend. IV. The Supreme Court has long recognized that a warrantless arrest of an

individual in a public place, when supported by probable cause, does not violate the

Fourth Amendment. <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 423-24 (1976).

Probable cause is an amorphous concept. <u>Ornelas v. United States</u>, 517 U.S. 690,

695-96 (1996).  It is "not readily, or even usefully, reduced to a neat set of legal

rules."  Id. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Its existence must be

determined from the view of the officer on the street, not the judge in the

courtroom.  United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States

v. Cortez, 449 U.S. 411, 418 (1981).  Probable cause exists when circumstances

within a police officer's knowledge are sufficient for a prudent person to conclude

that a person has been or is committing an offense.  Beck v. Ohio, 379 U.S. 89, 91

(1964).  Mere suspicion is insufficient, but evidence beyond a reasonable doubt is

not required.  Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

When information derived from an informant is used in the officer's assessment of

probable cause, the court considers the informant's veracity, reliability, and basis of

knowledge in its review of the totality of the circumstances.  Gates, 462 U.S. at 233.

The troopers clearly possessed probable cause to arrest Ray.[2]  First, the

troopers obtained information from Bobb that an individual named "Diego" was

trafficking controlled substances.  The troopers confirmed that "Diego" was Ray

through the use of law enforcement networks and databases.  Indeed, Bobb

identified "Diego" as Ray when shown Ray's photograph.  Trooper Mearkle heard

_____

[2] In its analysis, the court employs the "collective knowledge doctrine," under
which the knowledge of one law enforcement officer may be imputed to another
when the officers are conducting a joint endeavor.  See United States v. Whitfield,
634 F.3d 741, 745-46 (3d Cir. 2010) (applying the collective knowledge doctrine to a
Terry seizure); United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) (applying
the collective knowledge doctrine when analyzing whether officers possessed
sufficient probable cause for an arrest).

Bobb's multiple conversations with "Diego" in which they discussed a planned

transaction and referenced prior firearm and drug transactions.

Through surveillance, the troopers observed a Honda carrying Ray arrive at

the pre-determined meeting location at approximately the designated time. The

vehicle's rapid departure and subsequent phone call to Bobb identifying the area as

"too hot" was consistent with a planned drug transaction. The change of the

meeting location, the instruction to Bobb to remain on the telephone, and the

request to speak with Bobb's companion, all demonstrated a clear consciousness of

guilt. When Trooper Fidler observed the same Honda parked three blocks away

from the second meeting location, with a clear view of the intersection, he

reasonably inferred that the vehicle's occupants were conducting counter-

surveillance of the area. Once Trooper Fidler identified Ray at the second pre-

determined meeting location, he possessed probable cause to arrest.

Ray attacks the reliability of Bobb and asserts that there is no independent

corroboration of the substance of Bobb's conversations with Ray or even that Bobb

was actually speaking to someone else on the phone. However, Ray's actions, as

captured by surveillance, were entirely consistent with the substance of the

information and conversations Bobb relayed to law enforcement. Moreover,

Troopers Mearkle and Fidler interacted with Bobb face-to-face, and had an

opportunity to evaluate his credibility through direct, personal observation. Law

enforcement officers had already arraigned Bobb, and he was in their custody

throughout the surveillance and arrest of "Diego." Hence, the troopers could have

8

held Bobb responsible if he had fabricated his allegations.  The court finds that the

information provided by Bobb was sufficiently reliable and independently

corroborated.  Based on a totality of the circumstances, the troopers possessed

probable cause to arrest Ray.[3]  Therefore, the exclusionary rule does not apply to

evidence obtained as a result of Ray's arrest.

### B.      Application of the ECPA

Ray also seeks to suppress the recording of Bobb's telephone call with

"Diego," and any evidence derived from the recording, under the Electronic

Communications Privacy Act, 18 U.S.C. § 2510 *et seq* ("ECPA").  Under the ECPA,

any "aggrieved person" may move to suppress the contents of unlawfully

intercepted wire or oral communications, or evidence derived therefrom.  18 U.S.C.

§ 2518(10)(a).  An "aggrieved person" means a person "who was a party to any

intercepted wire, oral, or electronic communication or a person against whom the

interception was directed."  § 2510(11).  "Intercept" under the statute is defined as

"the aural or other acquisition of the contents of any wire, electronic, or oral

communication through the use of any electronic, mechanical, or other device."

§ 2510(4).  "Wire communication" is defined as "any aural transfer made in whole or

in part through the use of facilities for the transmission of communications by the

---

[3] Ray also attempts to attack Trooper Fidler's sensory perception as it relates
to his identification of Ray at both meeting locations.  This argument is unavailing.
The court had the opportunity to observe Trooper Fidler's testimony firsthand, and
credits that testimony regarding his identification of Ray at both locations.

aid of wire, cable, or other like connection between the point of origin and the point of reception." § 2510(1).

Ray argues that even though the recording only captures Bobb's side of the telephone conversation, he is nevertheless an "aggrieved person" under the purview of the statute because he was the "person against whom the interception was directed." See United States v. Oliva, 705 F.3d 390 (9th Cir. 2012) (holding that defendant had standing to challenge interceptions even though he refused to admit that the voices in the conversations intercepted included his own). While it may be true that the troopers intended to utilize the interception against Ray, an actual interception never occurred as contemplated by the statute. The recording device merely recorded what Bobb stated into the microphone. (Doc. 227 at 10-11). Hence, law enforcement never recorded any aural transfer made through the use of the cell phone. Moreover, the recording merely reflects the extent of the conversation that was already available to Trooper Mearkle by virtue of his physical presence with Bobb. Ray cannot reasonably claim to have an expectation of privacy in Bobb's half of the conversation. Thus, the provisions of the ECPA do not

apply[4] and the court will not suppress the one-sided recording of Bobb's telephone call with "Diego" or any evidence derived therefrom.

## IV.   Conclusion

For the foregoing reasons, the motion to suppress (Doc. 211) will be denied. An appropriate order follows.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        April 10, 2014

---

[4] Even if the ECPA did apply, the recording would not be suppressed because Bobb voluntarily consented to the recording.  See 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.").  Ray's assertions that Bobb did not voluntarily provide his consent to the recording are meritless.